**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**KEVIN PATRICK BIRD,**

      **Plaintiff,**

**v.**                                  **Case No.: 2:17-cv-03058**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 12, 17).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be

1

**GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On August 12, 2013, Plaintiff Kevin Patrick Bird ("Claimant") completed applications for DIB and SSI, alleging an amended disability onset date of August 3, 2013, on the basis that he had back, neck, knee, and hip pain; Type 1 diabetes mellitus; fatigue/exhaustion; hearing loss in both ears; "eyesight troubles" in both eyes; and high blood pressure. (Tr. at 263-74, 287, 310). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 12). Claimant filed a request for an administrative hearing, which was held on September 15, 2015 before the Honorable Toby J. Buel, Sr., Administrative Law Judge ("ALJ"). (Tr. at 68-105). A supplemental administrative hearing was held on January 25, 2016. (Tr. at 31-67). By written decision dated February 24, 2016, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 9-30). The ALJ's decision became the final decision of the Commissioner on March 31, 2017, when the Appeals Council denied Claimant's request for review. (Tr. at 1-76).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 8, 9). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 12), and the Commissioner responded with a Brief in Support of Defendant's Decision. (ECF No. 17). Therefore, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 41 years old at the time of his alleged onset of disability and 44 years

old at the time of the ALJ's decision. Claimant completed high school and one year of college and communicates in English. (Tr. at 309-11). He previously worked as a heavy equipment mechanic and maintenance clerk, coordinator, cleaner, planner, and manager. (Tr. at 62-63).

## III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the

3

measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2018. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since the amended alleged onset date of August 3, 2013. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ concluded that Claimant had the following severe impairments: "hypertension, diabetes, retinopathy, status post calcaneal fracture, conversion disorder versus seizures or convulsions, and obesity." (Tr. at 15, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 17-18, Finding No. 4). Accordingly, the

ALJ found that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he needs to work on level ground. He should never climb ladders, ropes, scaffolds, ramps, or stairs. He should never kneel or crawl. He is able to balance, stoop, and crouch occasionally. He should avoid hazards, moving machinery, and heights. The claimant should not drive a motor vehicle. He will be afflicted with chronic pain noticeable to himself at all time, but could maintain attention and concentration in two-hour increments with normal breaks.

(Tr. 18-22, Finding No. 5).

At the fourth step, the ALJ indicated that Claimant was able to perform his past relevant work as a maintenance clerk. (Tr. at 22-24, Finding No. 6). Further, the ALJ identified other jobs in the national economy that Claimant could perform. (Tr. at 23). The ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity, noting that (1) Claimant was born in 1979 and was defined as a younger individual on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (*Id.*). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including unskilled sedentary work as credit clerk, document preparation clerk, and security worker. (Tr. at 24). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (*Id.*, Finding No. 7).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

While Claimant's brief contains only a single heading asserting that "the ALJ failed

to properly weigh the opinions of [Claimant's] treating physicians," Claimant actually presents several discrete challenges to the Commissioner's decision. Considering Claimant's claims in the order of the sequential evaluation, Claimant first argues that the ALJ erred in his step three analysis of whether Claimant's impairments met or equaled a listed impairment. Claimant asserts that he "at a minimum, equals a listing as the combination of impairments between listings 1.00, 9.00, 11.00, serve to disable him from performing substantial gainful activity." (ECF No. 12 at 23). Claimant contends that at step three the ALJ summarily dismissed the testimony of his mother, who is a registered nurse, and the testimony of his wife in evaluating his hypoglycemia and seizure activity under listings 9.00 and 11.00, despite the fact that "testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available." (*Id.* at 20).

Claimant further challenges the weight that the ALJ assigned to the evidence in assessing his RFC. First, as noted, Claimant argues that insufficient weight was given to the testimony of his mother and wife—testimony which Claimant describes as being "entirely consistent with the record"—solely on the basis of their presumed bias in Claimant's favor. (*Id.* at 21). Second, Claimant argues that "the ALJ violated the treating physician's rule in giving little weight or consideration to the effect of the combined opinions of" his treating physicians Drs. Eggleston, Borad, and Bishara. (*Id.* at 11). Claimant specifically points to Dr. Bishara's opinions that Claimant's left heel fracture (calcaneal injury) was a "life changing injury" that would likely necessitate a fusion procedure in the future. (ECF No. 12 at 11-16). Claimant argues that Dr. Bishara, a board-certified orthopedic surgeon, was the most specialized expert to render an opinion as to his heel injury. Further, Claimant contends that Dr. Bishara's opinions were very clearly

supported by the record and not contradicted by other opinions. (*Id.* at 12-15). Claimant asserts that instead of according great weight to his treating physicians' opinions, the ALJ inappropriately relied on Dr. Brendemuehl, an agency expert, who did not consider Claimant's organic brain issues. Claimant adds that Dr. Brendemuehl's opinions did nothing to negate the findings of Claimant's actual treating physicians regarding his heel injury and uncontrolled diabetes. (*Id.* at 19-20).

Next, Claimant asserts that the ALJ blatantly violated Claimant's due process rights by asking him to remove his shoes, socks, and ankle brace during the administrative hearing in order to conduct an examination, and then the ALJ inappropriately substituted his own opinion for that of the medical professionals. (*Id.* at 15). In another challenge, Claimant argues that the ALJ dismissed the cumulative effect of Claimant's "diabetic condition, seizure disorder, resulting falls (with broken bones) and left occipital infarct, which render him incapable of performing work-like tasks and movements on a consistent and reliable basis;" further, Claimant states that the ALJ did not even mention his hearing loss. (*Id.* at 16-18). In his final challenge, Claimant states that in making the step five finding, the ALJ relied on the vocational expert's response to a hypothetical question that did not fairly set out all of Claimant's impairments, because the question omitted any limitations related to his seizure activity or calcaneal injury. (*Id.* at 22-23).

In response to Claimant's arguments, the Commissioner contends that the ALJ performed a proper step three analysis and correctly found that Claimant did not meet any of the applicable listings. The ALJ also accurately limited Claimant to a reduced range of sedentary work. (ECF No. 17 at 11-15). As to Dr. Bishara's notations that Claimant had a "life altering injury" and would not have "the same function as he did previously," the Commissioner disagrees that these are medical opinions. (*Id.* at 16). The Commissioner

argues that, instead, these comments are simply medical evidence, which do not reflect any specific opinions regarding Claimant's functional limitations, and are not required to be weighed like medical opinions. (*Id.* at 16-17). Further, to the extent that Dr. Bishara's notes indicate that Claimant is disabled or unable to work, the Commissioner states that the notes are not entitled to any special significance as such issues are administrative findings reserved to the Commissioner. (*Id.* at 17). The Commissioner also argues that the ALJ's treatment of Dr. Brendemuehl's testimony was supported by substantial evidence. (*Id.* at 17-20). Regarding the cumulative effect of Claimant's impairments, the Commissioner asserts that the ALJ included all credibly established limitations supported by the record in the RFC finding. (*Id.* at 20-21). As to Claimant's purported hearing loss, the Commissioner argues that Claimant never sought or received treatment for hearing loss, did not use a hearing aid, and other examinations showed that his hearing was intact. Further, the Commissioner notes that the document preparation clerk job that the ALJ found Claimant capable of performing did not require hearing. (*Id.* at 21). The Commissioner additionally argues that the ALJ reasonably found that any additional limitations for off-task behavior due to seizure activity or Claimant's status post calcaneal fracture were unwarranted. Lastly, the Commissioner maintains that Claimant did not establish a violation of his due process rights during the administrative hearing, and substantial evidence supports the ALJ's review of the lay witness testimony from Claimant's wife and mother. (*Id.* at 22-28).

## V.    **Relevant Evidence**

The undersigned has considered all of the evidence of record, including documentation of medical examinations, treatment, evaluations, and statements. The information that is most relevant to Claimant's challenge is summarized as follows.

### A. Treatment Records

Nearly a decade before his alleged onset of disability, Claimant reportedly passed out while driving to work in April 2004, and his vehicle was found by emergency responders in a ditch with no exterior damage. (Tr. at 425). Claimant's only complaint upon arrival to the emergency room was a moderate headache. He stated that he had experienced seizures in the past, following a head injury, which were always accompanied by a headache. (*Id.*). On examination, Claimant's blood glucose level was found to be severely low at 23 mg/dl.[1] (*Id.*). Claimant reported that his blood glucose was normally fairly well controlled. (*Id.*). A brain MRI and a CT scan of his head were normal. (Tr. at 434-35). The attending physician concluded that Claimant had experienced a seizure, which was most likely caused by severe hypoglycemia/uncontrolled diabetes. (Tr. at 522).

On August 23, 2012, Claimant saw family nurse practitioner, Vicki Spurlock, in follow up of his chronic conditions. Claimant reported that he smoked one-half pack of cigarettes per day and was laid off from work. (Tr. at 396). He denied having blurry vision, changes in vision, eye pain, or photophobia. (*Id.*). His physical examination was normal other than a fungal infection of the nail on his left foot. (*Id.*). Claimant's diabetes was noted to be "uncontrolled," so he was counseled on diabetic education and advised to quit smoking. (*Id.*).

On April 4, 2013, Claimant saw a nurse practitioner for refills of his diabetes medications. (Tr. at 398). Claimant noted that his blood glucose levels had been "crazy" recently, ranging between 102-180 mg/dl range and once as high as 280 mg/dl, although

---

[1] The American Diabetes Association (ADA) recommends fasting blood sugar range for someone with diabetes is 80-130 mg/dl and less than 180 mg/dl two hours after meals. *See* http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/checking-your-blood-glucose.html

Claimant denied changing his diet. (*Id.*). His blood sugar was 226 mg/dl at the time of his visit. (*Id.*). Claimant was alert, in no acute distress, and his cardiovascular, pulmonary, and abdominal examinations were all negative. (*Id.*).

On November 12, 2013, shortly after his alleged onset of disability, Claimant was seen by ophthalmologist, G.Y. Dagher, M.D., for a diabetic eye examination. Claimant was diagnosed with pre-proliferative retinopathy in his left eye and early proliferative retinopathy in his right eye. (Tr. at 453). His visual acuity was 30/20 in his left eye and 60/20 in his right eye. (*Id.*). Dr. Dagher performed laser photocoagulation on Claimant's left eye three days later and performed the same procedure on Claimant's right eye on December 6, 2013. (Tr. at 454-55). In the period between his laser surgeries, Claimant went to a hospital clinic for a cough on November 19, 2013. His gait was observed to be normal, and his hearing was intact bilaterally. (Tr. at 461).

On December 30, 2013, Claimant presented to the emergency room at Charleston Area Medical Center, stating that he had increased light sensitivity, pain in his left eye, and blurred vision following his laser eye surgeries. (Tr. at 439). Claimant was diagnosed with conjunctivitis and prescribed antibiotic drops. (Tr. at 440). He was strongly encouraged to see an ophthalmologist for full examinations of his eyes. (*Id.*).

On January 20, 2014, Claimant saw internist, Robert Eggleston, M.D. (Tr. at 473). Claimant had moderate complaints regarding diabetes, but was not monitoring his blood glucose at home, keeping a diary, exercising, or following a diabetic diet. (*Id.*). Claimant stated that he lost his blood glucose meter, but would resume checking his blood glucose if he was given a new one. (*Id.*). Claimant denied vision changes, and his physical examination was unremarkable. (Tr. at 474, 476-77). He was continued on Lantus slow-release insulin injections. (Tr. at 477). He was also taking the diabetes medications,

Trajenta and Precose; a blood pressure medication, Losartan; and a smoking cessation aid and anti-depressant, Wellbutrin. (Tr. at 474).

Claimant saw Dr. Eggleston again on April 30, 2014. His hypertension was stable. (Tr. at 506). Claimant was monitoring his blood glucose, but he still had hypoglycemic episodes and believed that they were due to Precose. (*Id.*). Dr. Eggleston ordered testing and continued Claimant on Lantus, Humalog, and Losartan. (Tr. at 507, 510). A chest x-ray showed no abnormalities. (Tr. at 512). A CT scan of Claimant's head showed a mild prominence of the posterior horn of the left lateral ventricle that was non-specific in appearance; no obstructing mass or acute traumatic abnormalities were identified. (Tr. at 513).

After leaving Dr. Eggleston's office, Claimant reportedly passed out and fell down three to four steps; Claimant had missed lunch due to his doctor's appointment and "knew" he was hypoglycemic. (Tr. at 536). However, Claimant stated that syncopal events happened weekly, and he regularly checked his blood glucose and documented syncopal episodes with normal or only slightly high readings. (*Id.*). After the fall, Claimant had abrasions and tenderness in his left upper quadrant, but was eating lunch and feeling well. (Tr. at 538). Hypoglycemia was thought to be the cause of Claimant's fall. (Tr. at 539).

On May 21, 2014, Claimant saw Dr. Eggleston for syncope. (Tr. at 500). Claimant reported having episodes of weakness at night every 8 to 10 days. (*Id.*). He also reported having a seizure disorder in the past, after sustaining a head injury, but stated that he had not had a grand mal seizure in a long time. (*Id.*). Claimant denied vision changes. (Tr. at 501). His physical examination was unremarkable. Dr. Eggleston diagnosed Claimant with diabetes, fatigue/weakness, and partial seizure with complex symptomology. (Tr. at 504).

Claimant followed up with Dr. Eggleston on June 5, 2014. The severity of Claimant's diabetes was noted as mild. (Tr. at 494). He did not keep a diary, but believed that his blood glucose was "running ok" and staying around 150 mg/dl. (*Id.*). Claimant used Lantus on a sliding scale and stated that the decrease in Lantus stopped the hypoglycemic episodes. (*Id.*). Claimant reported that he never heard from a neurologist for evaluation of his seizures. (*Id.*).

On July 7, 2014, Claimant followed up with Dr. Dagher. Claimant's retinopathy was noted to be stable following laser surgery with a bilateral visual acuity of 20/20. (Tr. at 532). Claimant saw Dr. Eggleston on October 3, 2014, stating that his "episodes" had decreased and he had not had any recently, which seemed to be due to stabilization of his blood glucose. (Tr. at 487). Claimant again denied vision changes and his physical examination was still unremarkable. (Tr. at 488, 490). His diagnoses were hypertension, diabetes mellitus, and lateral epicondylitis. (Tr. at 491). Claimant was continued on Precose, Lantus, and Humalog for diabetes. (Tr. at 488). He was also on Keppra and Losartan. (Tr. at 492).

On December 8, 2014, Claimant saw Dr. Dagher, who deemed Claimant's diabetic retinopathy to be stable, although he did have conjunctivitis in his left eye. (Tr. at 533). His visual acuity remained 20/20 bilaterally. (*Id.*). Claimant saw Dr. Eggleston the next month on January 28, 2015. His hypertension was stable, and his seizure disorder had improved recently. (Tr. at 625). Claimant was on Keppra for seizures and had only one seizure the prior month. (*Id.*). His physical examination was unremarkable. He was continued on Lantus. (Tr. at 628-29).

Claimant followed up with Dr. Eggleston again on April 7, 2015. Claimant's hypertension was stable and his blood glucose diary showed that he was "at goal,"

although his blood glucose occasionally was elevated for reasons unrelated to diet. (Tr. at 631). Claimant reported episodes of "lost time." (*Id.*). He stated that it happened twice, and on one of the occasions, he almost drove off of the road, but his daughter yelled at him and averted an accident. (*Id.*). Claimant stated that his children did not ride with him any longer for their safety. (*Id.*). He denied any headaches or other neurological deficits, but stated that he could not remember the events of the day. (*Id.*).

On April 12, 2015, Claimant presented to the emergency room at Montgomery General Hospital with right forearm pain. He stated that he had a seizure in the bathroom early in the morning and fell across the opening to the shower. (Tr. at 612). His wife found him lying on the floor on top of his arm. He was concerned that his forearm was fractured. (Tr. at 612-13). An x-ray revealed that Claimant had indeed fractured the distal one-third of the diaphysis of the ulna in his right arm. (Tr. at 616). Five days later, on April 17, 2015, Claimant presented to orthopedist, Frederick Pollock, M.D., for follow-up. Claimant had tenderness in his right forearm, but normal sensation and motor function in his right hand, strong right radial pulse, and full range of motion in his right shoulder. (Tr. at 650). Claimant was placed in a forearm splint and advised to return in three weeks for a recheck. (*Id.*). Claimant was "doing well" at his recheck with Dr. Pollock on May 8, 2015. (Tr. at 654). His x-ray showed callus formation around the fracture, with adequate alignment. (*Id.*). Dr. Pollock recommended that Claimant continue wearing the wrist splint over the next three weeks and work on range of motion exercises. (*Id.*).

On May 16, 2015, Claimant saw neurologist, Samip J. Borad, M.D., for evaluation of seizure activity. Claimant related that he sustained a head injury in a motor vehicle accident in 2000, was unconscious for a few days, and had three seizures during that time. (Tr. at 605). He was put on Dilantin, but it was discontinued. (*Id.*). Claimant stated that

he had suffered three grand mal seizures since January 2015, which usually occurred at night; Claimant described them as a loss of consciousness, passing out, and shaking, followed by a terrible headache. (*Id.*). Claimant stated that he fell in the bathroom during one episode and broke his right wrist. (*Id.*). The episodes were not always associated with hypoglycemia. (*Id.*). Further, Claimant reported having seven spells since January 2015 in which he had tremors that lasted approximately five minutes, but he did not lose consciousness. (*Id.*). Lastly, Claimant reported that in that same time frame, he also had three episodes of losing track of time for approximately three hours and had hypoglycemic episodes of being sweaty and "not feeling right." (*Id.*). Claimant's mental status, neurological, and musculoskeletal examinations were normal; his coordination was intact; and his gait was "nonconcerning." (Tr. at 606). Dr. Borad ordered testing and increased Claimant's dosage of Keppra. (*Id.*).

On June 18, 2015, Claimant suffered a comminuted left calcaneus fracture after reportedly jumping from a ladder only a couple of feet from the ground. (Tr. at 580, 584, 589, 596, 598-99, 600-01). The same month, Claimant had a brain MRI on June 22, 2015, which showed a remote left occipital infarct. (Tr. at 791).

On June 29, 2015, Claimant followed up with orthopedic surgeon, Ereny Bishara, D.O. On examination, Claimant had full range of motion at the shoulders, elbows, and wrists and in his right lower extremity. (Tr. at 657). In his left lower extremity, he could straight leg raise with negative logroll of his hip. (*Id.*). He had full range of motion in his knee and positive distal pulses; his plantar flexion, dorsiflexion, and sensations were intact; and he did not have calf tenderness. (*Id.*). However, he had positive ecchymosis and moderate swelling of the dorsum of his foot and ankle. (*Id.*). Dr. Bishara discussed non-operative versus operative management with Claimant and noted that Claimant

understood that he had a life-altering injury and would not have the same function as he did previously. (*Id.*). Dr. Bishara further stated that Claimant understood the injury would require three months of non-weight bearing with strict ice and elevation requirements. (*Id.*). Dr. Bishara discussed the minimal improvement expected with surgical intervention and the likelihood that a fusion procedure would be needed in the future. (*Id.*). In light of his diabetes and smoking history, Claimant had a higher risk of post-surgical complications of infection and risk of amputation. (*Id.*). Given this information, Claimant was amenable to non-operative treatment; thus, he was placed back into a splint and told to return in two weeks. Once the swelling subsided, Claimant would receive a well-padded short cast. (*Id.*). He was given pain medication and told to ice and elevate his leg. (Tr. at 658).

On June 30, 2015, Claimant had testing to evaluate his seizures. An EEG test administered by Dr. Borad was normal. (Tr. at 669). A brain MRI again revealed a remote left occipital infarct. (Tr. at 671). Claimant saw Dr. Eggleston the next month, on July 8, 2015. Claimant's hypertension was stable, but his blood glucose was running above goal, especially in the evenings. (Tr. at 638).

On July 21, 2015, Claimant saw nurse practitioner, Natalie Allen, at the Orthopedic Trauma Group. Claimant was not using his left leg and was ambulating with crutches. (Tr. at 580). His pain was significantly better, and he reported that he only had to take pain medication one night over the last several weeks. (*Id.*). He was in no acute distress, but had edema in his left foot and ankle, numbness in the superficial peroneal nerve distribution, and pain upon palpation of the left calcaneus. (*Id.*). X-rays showed that the fracture was healing. (*Id.*). Claimant was placed in a cam boot and instructed to work on left ankle range of motion exercises. (*Id.*). Claimant also saw Dr. Borad and stated that

since his last visit, he had one grand mal seizure; five episodes of tremors, some of which were associated with hypoglycemia; and one to three hypoglycemic episodes. (Tr. at 787). Claimant was referred for testing and continued on Keppra, as his hypoglycemic episodes needed to be controlled before there were any medication adjustments. (*Id.*).

Claimant had an EEG study from August 1 to August 4, 2015, which was normal. (Tr. at 794).  On August 26, 2015, Claimant followed up with Dr. Borad. Claimant denied seizures or any side effects from Keppra, noting that there were no more episodes after his insulin was adjusted. (Tr. at 603). He was continued on Keppra. (*Id.*).

On August 31, 2015, Claimant again saw Ms. Allen and stated that he had been doing well. (Tr. at 664). Claimant was wearing a cam boot and was somewhat weight bearing on his left lower extremity, but was using crutches to assist with ambulation. (*Id.*). He had only mild swelling of his left foot and his pain was well controlled. (*Id.*). He had no signs of infection; his sensation was intact; and he had brisk capillary refill and palpable dorsalis pedis pulses. (*Id.*). Claimant had mild swelling in his left medial ankle, could not invert or evert his left foot, and was somewhat stiff with plantar flexion, but he had near full dorsiflexion and denied pain upon palpation range of motion of his left foot. (*Id.*). X-rays showed interval healing of the fracture. (*Id.*). Claimant was again told that it was a "life changing injury" and that he would likely have to wear a larger shoe size on that foot. (*Id.*). Claimant was progressed to physical therapy to work on weight bearing and range of motion. (*Id.*).

On October 5, 2015, Claimant saw Dr. Eggleston. Claimant's hypertension was stable, and his hypoglycemic events were reduced after Claimant adjusted his insulin intake and snack time. (Tr. at 718). He denied any vision change, and his physical examination was unremarkable. Claimant's diagnosis was diabetes with diabetic

mononeuropathy for which he was referred to nurse practitioner, Alice Lockman, for consideration of an insulin pump. (Tr. at 721, 729). Claimant saw Ms. Lockman on October 13, 2015. Claimant's diet was described as uncontrolled, and he did not exercise. (Tr. at 729). He was counseled regarding a diabetic diet and instructed to maintain his blood glucose diary. (Tr. at 733). Ms. Lockman planned to review Claimant's lab work and instructed him to return in three weeks. (*Id.*).

In September and October 2015, Claimant had eleven physical therapy sessions. (Tr. at 693-704). At a session on October 20, 2015, the physical therapist noted that Claimant was scheduled for discharge at his next visit. (Tr. at 693). Claimant had good strength, but some difficulty with balance. (*Id.*). He was not in pain, but did not display the desired level of ankle mobility. (*Id.*).

On November 13, 2015, Claimant presented to Ms. Lockman for routine follow up. He reported having two seizures since his last office visit. He was tolerating his medications, but was waiting on an insulin pump. (Tr. at 737). Claimant reported that his fasting blood glucose was normally greater than 120 mg/dl; however, he admitted that he did not control his diet or exercise. (*Id.*). His neurological examination was normal, including intact deep tendon reflexes, normal mental status, no ataxia or unsteadiness in his gait, and normal muscle bulk and tone with no tremors. (Tr. at 740). Claimant's diagnoses were Type 1 diabetes mellitus with unspecified complications and unspecified convulsions. (*Id.*). His treatment plan was continued. (Tr. at 741).

Claimant saw Ms. Lockman again on December 10, 2015. He reported having two more seizures since his last office visit. (Tr. at 742). His physical examination did not reveal any issues, including no issues with Claimant's gait. (Tr. at 744-45). Claimant was instructed to maintain his blood glucose diary and return in four weeks. (Tr. at 745).

On January 5, 2016, Claimant saw Dr. Eggleston. Claimant was monitoring his blood glucose, but failed to keep a diary. Claimant stated that his levels "jumped around during [the] holidays." (Tr. at 747). Claimant was taking Keppra for his pseudoseizures, which his neurologist stated were not neurologically related. (*Id.*). Claimant now reported having one breakthrough seizure per month as opposed to weekly. (*Id.*). His physical examination did not reveal any issues. (Tr. at 749-50). Dr. Eggleston's diagnoses were conversion disorder with seizures or convulsions and Type 1 diabetes mellitus with unspecified complications. (Tr. at 750).

On January 6, 2016, Claimant saw Ms. Allen in follow-up of his left calcaneus fracture. Claimant presented weight-bearing, as tolerated, in a regular shoe. (Tr. at 777). Claimant stated that he completed physical therapy and did not have difficulties walking on flat ground, but could not walk on hills, had increased pain with cold weather, and had experienced a couple of falls. (Tr. at 777). X-rays showed that his fracture was healed. (*Id.*). Claimant's examination was largely normal, including full dorsiflexion and plantar flexion, but he had difficulties with inversion and eversion of the left foot and pain complaints with range of motion. (*Id.*). Claimant was instructed to continue weight-bearing as tolerated, referred for more physical therapy, and prescribed an ankle brace per his request. (*Id.*). Claimant requested narcotic pain medications, but was instructed to use over-the-counter pain relievers. (*Id.*). Two days later, Claimant saw Dr. Dagher. Claimant's visual acuity was 20/30 bilaterally. (Tr. at 761). His diagnoses were diabetic retinopathy/macular edema and dry eyes. (*Id.*). Photocoagulation was explained/scheduled, and he was prescribed Systane Tears. (*Id.*).

On February 23, 2016, Claimant saw Dr. Borad. Claimant reported approximately two seizures per month, which included inability to communicate, muscle tremors, and

loss of consciousness at times, but no incontinence or aura. (Tr. at 785). Claimant's Keppra was increased. (*Id.*). Claimant saw Dr. Borad again on April 26, 2016. Claimant reported that he had one seizure since his last visit, which occurred while he was driving, but he happened to be stopped at a red light. (Tr. at 784). Claimant described the seizure as "shaking all over" and lasting two to three minutes. (*Id.*). Dr. Borad again increased Claimant's dosage of Keppra. (*Id.*).

### B. Evaluations and Opinions

On October 31, 2013, Claimant had a consultative disability examination performed by Miraflor G. Khorshad, M.D., at which Claimant reported blurred vision, bilateral hearing loss, chronic fatigue, dizziness, cold intolerance, and increased numbness and pain in his legs and feet. However, he denied seizures or fainting spells. (Tr. at 418-20). Claimant's corrected near visual acuity was 20/70 bilaterally, and he had conduction deafness at 2000 to 4000 Hz frequencies 25 decibel HI bilaterally. (Tr. at 419). Claimant stated that his fasting blood glucose usually ranged between 125 and 140 mg/dl and ranged anywhere from 50 to 500 mg/dl before lunch and dinner. (Tr. at 420). He took Lantus before breakfast and Humalog on a sliding scale depending on his glucose level. (*Id.*). Dr. Khorshad's diagnoses were diabetes mellitus with retinopathy, nicotine dependence, COPD, essential hypertension, bilateral conduction deafness, and bilateral onychomycosis. (*Id.*).

On November 20, 2013, Amy Wirts, M.D., assessed Claimant's physical RFC based upon a review of his records, including the results of his consultative examination. Dr. Wirts found that Claimant had no exertional limitations, but was limited to frequently stooping, kneeling, crouching, and crawling; occasionally climbing ramps/stairs and balancing; and never climbing ladders/ropes/scaffolds. (Tr. at 121). Dr. Wirts found that

Claimant also had a mild hearing limitation in both ears and should avoid concentrated exposure to temperature extremes, noise, fumes, and hazards. (Tr. at 122). Dr. Wirts considered Claimant's statements to be "mostly credible," noting that he had seizure activity on April 14, 2004 due to severe hypoglycemia, a past motor vehicle accident, syncope with loss of consciousness, and Type 1 diabetes. (*Id.*). However, Dr. Wirts also noted that Claimant's April 2004 brain MRI was normal; he had a normal gait and did not use an assistive device at his consultative examination in November 2013; and his activities of daily living included driving and shopping. (*Id.*).

On March 7, 2014, Karl G. Hursey performed a psychiatric review technique based upon a review of Claimant's records. Mr. Hursey found that Claimant had mild restrictions in activities of daily living and maintaining concentration, persistence, or pace, but no difficulties in social functioning or repeated episodes of decompensation of extended duration. (Tr. at 144). On March 12, 2014, Curtis Withrow, M.D., affirmed Dr. Wirts' assessment except that Dr. Withrow found that Claimant should avoid even moderate exposure to noise and hazards. (Tr. at 134-35).

At Claimant's initial administrative hearing, general surgeon, Judith Brendemuehl, M.D., provided expert medical testimony. Dr. Brendemuehl stated that Claimant was an insulin-depended diabetic with a history of hypoglycemia. (Tr. at 77). When Claimant's blood glucose dropped to a certain level, he experienced "myoclonic jerks," which Dr. Brendemuehl explained were not true epilepsy, but were "like having a seizure without the incontinence." (*Id.*). After such episodes, Claimant experienced headache and disorientation, but was not as postictal as he would be after a seizure. (Tr. at 78). Dr. Brendemuehl noted that Claimant's visual acuity was 20/20 with correction of his diabetic retinopathy, and there was no evidence that he had nephropathy or peripheral

neuropathy. (Tr. at 79). He had sleep apnea with some daytime somnolence, but it was below the level that typically interfered with activities. (*Id.*). Dr. Brendemuehl explained that the reason Claimant's heel injury was "life altering" was that such an injury almost never healed without loss of joint space and associated arthritic changes that ultimately required a fusion procedure, thus limited hind foot mobility. (*Id.*).

Dr. Brendemuehl testified again at Claimant's supplemental administrative hearing on January 25, 2016, stating that the most recent recording of Claimant's A1c, taken on October 15, 2015, was 6.5 and his goal was 5.6. (Tr. at 38). Therefore, Dr. Brendemuehl felt Claimant currently had better blood glucose control than he had in the past. (*Id.*). He also had diabetic retinopathy and photocoagulation in the past, but his visual acuity was preserved. (Tr. at 38, 41). (*Id.*). Dr. Brendemuehl opined that, based on the evidence as a whole, Claimant was reduced to sedentary exertion with no climbing of ladders, ropes, scaffolds, stairs, or ramps; no crawling; and no kneeling. (Tr. at 42).

### C. Claimant's Statements

At his supplemental hearing in January 2016, Claimant testified that he continued to drive and drove 20 miles per week on average. (Tr. at 45-46). He stated that he could not work due to "exhaustion" and "balance issues." (Tr. at 47). Claimant was wearing a prescribed ankle boot/brace on his left foot. (Tr. at 49-50). In a typical night, Claimant slept from 10:30 to 11:15 p.m. until 5:00 to 6:00 a.m., but never felt rested. (Tr. at 52). He also napped for a couple of hours during the day. (Tr. at 53). Claimant stated that the most significant issue that kept him from working was exhaustion and trouble staying awake. (*Id.*). He also had heel pain when ambulating on hard floors, could not walk on non-level ground due to his ankle impairment, and could not sit for an extended period and had to shift positions. Claimant stated that the frequency of his seizures varied. (Tr. at 54-55).

He would have "maybe one a day" for three or four months, then one per month, and then "go a month and have three or four incidents." (Tr. at 55). He had seizure type activity that caused tremors and also what his physician described as "breakthrough seizures," which resulted in memory loss, muscle fatigue, balance issues, and a headache. (*Id.*). Claimant had to rest after breakthrough seizures. He believed that his neurologist, Dr. Borad, ruled out his remote infarct as the cause of his seizures. (Tr. at 56).

### D. Lay Witness Testimony

Claimant's mother, Brenda Morris, who is a registered nurse, testified at Claimant's initial administrative hearing on September 15, 2015. Ms. Morris stated that Claimant had "gotten much worse" in the past "couple of years" and could not "do much anymore." (Tr. at 90, 93). Ms. Morris asserted that Claimant had seizures even when he was medically compliant. (Tr. at 91).

Claimant's wife, Charlene Bird, also testified at the initial hearing. (Tr. at 94). Mrs. Bird stated that Claimant suffered seizures that were not always related to his blood glucose level; he convulsed and sometimes lost consciousness, but at other times, he was simply disoriented. (Tr. at 95-100). Mrs. Bird testified that the seizures usually occurred every two or three weeks, although Claimant might go as long as a month without a seizure. (Tr. at 100). The seizures lasted three to seven minutes. (*Id.*). Mrs. Bird stated that she witnessed Claimant have a seizure each month from June through August. (Tr. at 102). After these seizures, Claimant was confused, exhausted, and had a headache for the remainder of the day. (Tr. at 103).

## VI.  <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial

evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   **Discussion**

### A. Step Three Analysis

Claimant contends that the ALJ erred at step three of the sequential evaluation, because he did not find that Claimant's "combination of impairments between listings 1.00, 9.00, 11.00" disabled him from performing substantial gainful activity. (ECF No. 12 at 23). Further, Claimant states that the ALJ summarily dismissed the testimony of Claimant's wife and mother in evaluating his hypoglycemia and seizure activity under listings 9.00 and 11.00. (*Id.* at 20).

A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in

the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. §§ 404.1525, 416.925. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 530; *see also* 20 C.F.R. §§ 404.1526, 416.926. In Title 20 C.F.R. §§ 404.1526, 416.926, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. *Id.* §§ 404.1526(b)(1), 416.926(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing

24

that the findings related to the claimant's impairment are at least of equal medical significance to those of a closely analogous listed impairment. *Id.* §§ 404.1526(b)(2), 416.926(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* §§ 404.1526(b)(3), 416.926(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan,* 493 U.S. at 531. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Here, the ALJ evaluated Claimant's heel impairment under section 1.02 of the Listing, the section which addresses major dysfunction of a joint(s) characterized by the following:

> [G]ross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or

> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.02. The inability to ambulate effectively is defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities" and it "is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* § 1.00B2b. The Listing further explains:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.*

Given the fact that Claimant's heel impairment did not affect Claimant's upper extremity, the ALJ evaluated whether it met or equaled the requirements of a gross anatomical deformity with chronic joint pain and stiffness and signs of limitation of motion or other abnormal motion of the affected joints; joint space narrowing, bony destruction, or ankyloses; and involvement of one of the major peripheral weight-bearing joint resulting in inability to ambulate effectively as defined in 1.00B2b. (Tr. at 17). The

ALJ found that Claimant's impairment did not meet the above requirements of listing 1.02. (*Id.*).

The ALJ's analysis is supported by substantial evidence. Claimant suffered a left calcaneus fracture in June 2015. (Tr. at 580). He was treated non-operatively, placed in a splint, and instructed not to bear weight on the injured foot for three months, and to follow strict ice and elevation requirements. (Tr. at 657). By August 2015, Claimant was placing some weight on his left lower extremity and using crutches to assist with ambulation. (Tr. at 664). Claimant completed physical therapy. In November and December 2015, Claimant had no ataxia or unsteadiness in his gait. (Tr. at 693-704, 740, 745). In January 2016, it was noted that Claimant was weight-bearing in a regular shoe, his fracture was healed, and he had no difficulties walking on flat ground. (Tr. at 777). Although he had problems with inversion and eversion of his left foot and had pain with range of motion. Claimant had full dorsiflexion and plantar flexion. (*Id.*). He was referred for more physical therapy, prescribed an ankle brace per his request, and denied narcotic pain medication. (*Id.*). Based upon the above, the ALJ reasonably concluded that Claimant did not have major dysfunction of his joints resulting in an inability to ambulate effectively as required by listing 1.02. *See, e.g., Pittman v. Berryhill*, No. 7:16-CV-00356-RN, 2017 WL 6502852, at *10 (E.D.N.C. Dec. 19, 2017) (stating that there was substantial evidence to support the ALJ's finding that the claimant could ambulate effectively when the record did not disclose, nor did the claimant identify, evidence that he used "a walker, wheelchair, or two canes or crutches to move about or that such devices were medically required" and the record reflected the claimant walked without an assistive device and without difficulty).

As to Claimant's diabetes, the ALJ correctly noted that it was not a listed impairment. (Tr. at 17). However, the ALJ discussed that section 9.00 of the Listing pertaining to endocrine disorders provided guidance and directed the ALJ to consider applicable listings under other body systems. (*Id.*). The ALJ considered Social Security Ruling 14-2p, noting that Claimant's Type 1 diabetes mellitus had not caused listing-level, end-stage organ damage such as amputation, retinopathy, heart failure, peripheral vascular disease, gastroparesis, nephropathy, skin infections, neuropathies, or problems with cognition. (*Id.*). Per section 9.00B5(a)(ii) of the Listing, the ALJ evaluated Claimant's diabetic retinopathy under section 2.00 of the Listing for visual impairments. (*Id.*). The ALJ concluded that Claimant did not meet the requirements of listing 2.00 because the evidence did not show that Claimant had visual acuity of worse than 20/200 in the better eye after best correction, a mean deviation of -22 or worse in his better eye, or visual efficacy of 20 percent or less after best correction in his better eye. (*Id.*).

Substantial evidence again supports the ALJ's analysis. No evidence exists of issues such as nephropathy, peripheral neuropathy, or amputation resulting from Claimant's diabetes mellitus. (Tr. at 78-79). With respect to his diabetic retinopathy, Claimant underwent laser photocoagulation in November and December 2013. (Tr. at 454-55). Thereafter, his diabetic retinopathy was noted to be stable. (Tr. at 532-33). His visual acuity was 20/30 bilaterally in January 2016. (Tr. at 761). To meet the listing for statutory blindness, an individual must have central visual acuity of 20/200 or less in the better eye with the use of a correcting lens. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 2.00A2. Claimant clearly does not meet this criterion.

Finally, the ALJ evaluated Claimant's seizure disorder under section 11.03 of the Listing and determined that there was no documented, detailed description of a typical

seizure pattern including all associate phenomena, occurring more frequently than once weekly in spite of at least three months of prescribed treatment. (Tr. at 18).  Listing 11.03, the portion of the Listing pertaining to epilepsy, required documentation of a "typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.03.[2]

By his own admission, Claimant had "maybe one [seizure] a day" for three or four months, then one per month, and would then "go a month and have three or four incidents." (Tr. at 55). His wife corroborated that his seizures occurred every two or three weeks, but sometimes Claimant did not have a seizure for a month. (Tr. at 100). Claimant's contention that the ALJ disregarded the testimony of his wife and mother in evaluating listing 11.00 is misplaced, as these witnesses did not testify that Claimant suffered seizures of listing level frequency. Further, Claimant's medical records demonstrate that Claimant did not meet or equal Listing 11.03. Claimant stated to his physician in May 2014 that he had episodes of weakness at night every 8 to 10 days and had a seizure disorder in the past following a head injury, but had not had a "grand mal seizure" in a long time. (Tr. at 500). In October 2014, Claimant reported that the frequency of his "episodes" had decreased, and he had not had any recently, which seemed to be due to stabilization of his blood glucose. (Tr. at 487). In January 2015, Claimant stated that his seizure disorder had improved recently and in April 2015, Claimant

---

[2] In January 2017, Section 11.00 was substantially revised, *inter alia,* reserving listing 11.03. *Id.* However, the undersigned applied the version of the Listing in effect at the time of the ALJ's decision.

reported only episodes of "lost time" that occurred twice. (Tr. at 631). In May 2015, Claimant stated that he had three grand mal seizures in the past five months; some "spells" that included tremors, but he did not lose consciousness; some episodes of "lost time;" and some hypoglycemic episodes of being sweaty and not feeling "right." (Tr. at 605). In August 2015, Claimant denied seizures and stated that there were no more episodes after his insulin was adjusted. (Tr. at 603). In November and December 2015, Claimant reported two seizures per month. (Tr. at 737, 742). In January 2016, Claimant was having one "breakthrough seizure" per month. (Tr. at 747). Finally, in February 2016, Claimant reported two seizures per month and, in April 2016, Claimant reported only one seizure since his last office visit months before. (Tr. at 784-85). Therefore, the record substantially supports that Claimant's seizures were not of the frequency to meet the Listing.

To the extent that Claimant contends that his combination of impairments is equivalent to a listed impairment, Claimant fails to present medical findings equal in severity to all of the criteria of any listed impairment. (ECF No. 12 at 23). Claimant references listings 1.00, 9.00, and 11.00, but fails to effectively and specifically explain how his symptoms meet all of the severity criteria of any one of these impairments.

Therefore, for the reasons stated above, the undersigned **FINDS** that the ALJ's step three conclusion that Claimant did not meet any of these listings is supported by substantial evidence.

### B. Weight of the Evidence

Claimant further contends that the ALJ improperly weighed and evaluated the testimony provided by his mother and wife regarding their observations of Claimant's impairments and symptoms. (ECF No. 12 at 20-21). Claimant contends that the ALJ

"summarily dismisse[d]" their testimony despite it being "entirely consistent with the record" solely based on their presumed bias in Claimant's favor. (*Id.* at 21).

In addition to evidence from "acceptable medical sources," an ALJ may consider evidence from other sources, such as the Claimant's relatives, to determine the severity of a claimant's impairments and his residual ability to work. SSR 06-03P (S.S.A. Aug. 9, 2006), 2006 WL 2329939, at *2; 20 CFR 404.1513(d)(4) and 416.913(d)(4). In this case, the ALJ specifically considered the testimony of Claimant's mother and wife. (Tr. at 22). The ALJ referenced testimony by Claimant's mother regarding Claimant's black outs due to seizures, but pointed out that he "was doing better with compliance." (*Id.*). The ALJ further cited that Claimant's wife testified that she had witnessed Claimant's episodes of unconsciousness, but noted that at other times, he was able to respond. (*Id.*). As to the frequency of his episodes, the ALJ found Claimant's wife's testimony that Claimant experienced episodes every two to three weeks to be inconsistent with Claimant's own testimony and treatment records. (*Id.*). Overall, the ALJ found that Claimant's relatives' testimony was outweighed by the medical evidence discussed in the decision. The ALJ noted that a lay person's opinion as to a claimant's diagnoses, severity of symptoms, or side effects of medications in relation to the claimant's ability to work is far less persuasive when the record contains opinions from medical professionals on the same issues. (*Id.*). The ALJ remarked that the witnesses were not unbiased given their familial relationship to Claimant, and Claimant's wife had a personal financial interest in the outcome of the disability claim. (*Id.*). However, the ALJ emphasized that, most importantly, their statements were not consistent with other substantial evidence discussed in the decision.

The ALJ's evaluation of the testimony of Claimant's mother and wife complied with social security rulings and regulations and is supported by substantial evidence.

31

Despite Claimant's wife's testimony in September 2015 that her husband had seizures every two or three weeks, Claimant reported in January 2016 that he had only one breakthrough seizure per month; in February 2016, Claimant reported two seizures per month; and, in the two months until his next appointment, Claimant had only one seizure. (Tr. at 747, 784-85). Moreover, Claimant's wife conceded that Claimant sometimes did not have a seizure for a month. (Tr. at 100). As previously discussed, the ALJ clearly considered and incorporated the frequency and extent of Claimant's seizures into the RFC finding, imposing various limitations and noting that there was no evidence that Claimant had gone more than a few weeks without a seizure/episode. (Tr. at 21).

Overall, the ALJ did not assign little weight to the non-medical testimony simply because of the witnesses' familial relationship to Claimant. Rather, the ALJ did not find the testimony to be fully supported by the record. Therefore, the ALJ properly considered, weighed, and evaluated the non-medical evidence.

Claimant also argues that the ALJ "violated the treating physician's rule in giving little weight or consideration to the effect of the combined opinions of" his treating physicians Drs. Eggleston, Borad, and Bishara. (ECF No. 12 at 11). Claimant specifically points to Dr. Bishara's notation that his left heel fracture was a "life changing injury" that would likely necessitate a fusion procedure in the future. (*Id.* at 11-16). Claimant states that the ALJ relied on the testimony of the non-examining testifying expert, Dr. Brendemuehl, instead of giving proper weight to the opinions of his treating physicians.

When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical

sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[3] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ...

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.[4]

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

---

[44] Although 20 C.F.R. §§ 404.1527(c), ), 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), ), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

2. What an individual's RFC is;

3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at \*2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at \*2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at \*3.

In this case, the ALJ specifically noted Dr. Bishara's statement that Claimant's heel fracture was a "life altering injury" and that Claimant would not have the same function as he did previously. (Tr. at 20). However, the ALJ discussed that Claimant's final orthopedic follow-up visit in the record demonstrated that Claimant's fracture was healing; Claimant was somewhat weight bearing; and although Claimant had mild swelling and could not invert or evert his foot, he had near full dorsiflexion in August 2015. (*Id.*). As noted, subsequent records submitted to the Appeals Council and incorporated into the transcript of proceedings showed even more improvement than the

records before the ALJ and only bolster his findings. In January 2016, Claimant's fracture was healed, and he was weight bearing in a regular shoe. Although he had difficulties with inversion and eversion of his left foot and could not walk on hills, Claimant had no difficulty walking on flat ground and had full dorsiflexion and plantar flexion. (Tr. at 777).

The ALJ clearly took into account Dr. Bishara's statement and all of Claimant's medical records in order to evaluate the functional effects of Claimant's heel fracture. Claimant fails to show how Dr. Bishara's notation that Claimant's heel fracture was "life changing" and functionally limiting was inconsistent with the ALJ's RFC finding that reduced Claimant to a very limited range of sedentary work, including, *inter alia*, restrictions that Claimant must work on level ground; could never climb ladders, ropes, scaffolds, ramps, or stairs; and only occasionally balance, stoop, or crouch. (Tr. at 18). There is simply no merit to Claimant's contention that the ALJ violated the treating physician rule with respect to Dr. Bishara's statements.

As to Drs. Eggleston and Borad, Claimant does not identify any of Drs. Eggleston or Borad's opinions that the ALJ disregarded or to which the ALJ assigned little weight. As Claimant recognized, the ALJ assigned great weight to Dr. Eggleston's opinion that Claimant should not drive a car. (Tr. at 21). The ALJ found such limitation to be consistent with the evidence of record, which showed that Claimant had a "seizure/episode" at least every few weeks. (*Id.*).

Furthermore, Claimant does not assert any basis to support a finding that the ALJ incorrectly assigned great weight to Dr. Brendemuehl's opinions. Dr. Brendemuehl, a general surgeon, reviewed Claimant's records and provided expert medical testimony at both of Claimant's administrative hearings. As the ALJ discussed, Dr. Brendemuehl testified to Claimant's uncontrolled diabetes and hypoglycemic episodes, causing

myoclonic jerks, which she described as being like a seizure without incontinence. (Tr. at 21, 77). Dr. Brendemuehl noted that Claimant experienced headaches and disorientation after the episodes; however, at the supplemental hearing, Dr. Brendemuehl testified that Claimant's updated records showed better diabetic control. (Tr. at 21, 38). Dr. Brendemuehl considered the effects of Claimant's diabetes, including his diabetic retinopathy, emphasizing that his visual acuity was preserved following surgery and he did not have any nephropathy or peripheral neuropathy. (Tr. at 21, 38, 41, 79). Further, Dr. Brendemuehl specifically considered Claimant's heel fracture, explaining that it was "life altering" because that type of injury almost never healed without loss of joint space and associated arthritic changes, which generally required a fusion, thus limiting hind foot mobility. (Tr. at 79). Overall, based upon a thorough review of the evidence, Dr. Brendemuehl opined that Claimant's RFC was significantly reduced, to work at the sedentary exertional level with no climbing of ladders, ropes, or scaffolds, stairs, or ramps; crawling; or kneeling. (Tr. at 42). Dr. Brendemuehl added that Claimant should also avoid all heights, hazardous machinery, and should not operate a motor vehicle as part of a job unless he went a year without having a seizure episode. (*Id.*).

Claimant contends that Dr. Brendemuehl's opinion was not entitled to great weight because she did not consider his organic brain issues, the sequelae of his uncontrolled diabetes, or the "combined effects of [his] broken calcaneus." (ECF No. 12 at 19). However, Claimant fails to identify any functional effects of any such conditions that were overlooked by Dr. Brendemuehl or in the ALJ's RFC analysis. Claimant stated that his neurologist, Dr. Borad, suggested that the seizures could be correlated to the old remote occipital infarct, but he believed that Dr. Borad "ruled out" such correlation. (Tr. at 56). As shown above, Dr. Brendemuehl very clearly considered the frequency and effects of

Claimant's seizure activity; the effects of his uncontrolled diabetes, including his diabetic retinopathy; and the limitations imposed by his heel fracture. Further, Claimant repeatedly asserts that Dr. Brendemuehl's testimony was consistent with the findings of his treating physicians, which was a primary reason that the ALJ afforded Dr. Brendemuehl's testimony great weight. (ECF No. 12 at 19); (Tr. at 22).

Claimant frames his argument that the ALJ "violated the treating physician rule" by stating that the ALJ disregarded the opinions of his treating physicians in favor of the opinions of Dr. Brendemuehl, a non-examining expert. However, Claimant physicians did not provide opinions which conflicted with Dr. Brendemuehl's testimony or RFC assessment. In fact, the ALJ found Dr. Brendemuehl's' assessment to be consistent with Claimant's treatment records. Claimant's physicians did not offer any opinions as to Claimant's RFC and Dr. Brendemuehl's RFC assessment was the most restrictive that was offered in this matter. The ALJ reviewed and weighed all of the medical evidence and opinions and ultimately gave little weight to the state agency expert opinions which concluded that Claimant had no exertional limitations because the ALJ found that such opinions were not well explained, did not consider subsequent evidence such as Claimant's heel fracture, and did not have the benefit of Dr. Brendemuehl's testimony. The ALJ gave great weight to Dr. Brendemuehl's assessment that Claimant was reduced to a very limited range of sedentary work and the ALJ additionally assessed that Claimant could only work on level ground, was afflicted by chronic pain noticeable to himself at all times, and could only maintain attention and concentration in two-hour increments. (Tr. at 18).

For all of the above reasons, the undersigned **FINDS** that the ALJ properly considered and weighed the medical evidence and opinions in this matter.

### C. Due Process Violation

Claimant asserts that the ALJ conducted his own examination of Claimant's lower extremity during his administrative hearing, which violated his due process rights and "existing case law." (ECF No. 12 at 14-16). The only case which Claimant references is *Marbury v. Sullivan*, 957 F.2d 837, 840–41 (11th Cir. 1992), which Claimant states stands for the proposition that a hearing officer may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional. (*Id.* at 15).

*Marbury* is inapplicable in this case. The ALJ did not, drawing only upon his own observations of Claimant, choose to disregard the diagnoses of treating physicians in favor his own diagnosis. *Marbury*, 957 F.2d at 840. As stated in the decision, the ALJ very specifically relied upon the medical evidence and opinions concerning Claimant's heel fracture in assessing Claimant's RFC and determining whether Claimant was disabled. (Tr. at 20-22). The ALJ reduced Claimant to an extremely limited range of sedentary work due in large part to Claimant's heel impairment. The ALJ did not reference or provide any indication that his decision was impacted in any way by his own observations of Claimant's extremity during the hearing. Furthermore, the ALJ did not demonstrate any indicia of bias against Claimant such as to violate his due process rights. *See Carter v. Astrue*, No. 2:11CV665, 2012 WL 7783402, at *7–8 (E.D. Va. Oct. 16, 2012), *report and recommendation adopted,* No. 2:11CV665, 2013 WL 1165172 (E.D. Va. Mar. 20, 2013) (Discussing that social security claimants are entitled to procedural due process, including an impartial decision maker) (collecting cases) (citing *Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir 1995)).

Therefore, the undersigned **FINDS** that the ALJ did not violate Claimant's due process rights by examining his extremity during the administrative proceeding.

### D. Combination of Impairments

Claimant next argues that the ALJ dismissed the cumulative effect of Claimant's diabetes, seizures and "resulting falls (with broken bones)," and left occipital infarct. (ECF No. 12 at 16-18). Further Claimant states that the ALJ did not even mention his bilateral hearing loss, which Claimant contends would affect his capacity to work in certain sedentary circumstances. (*Id.* at 18).

An ALJ is required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). The relevant regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the United States Court of Appeals for the Fourth Circuit stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken

separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity."   *Walker,* 889 F.2d at 50.

The ALJ very clearly considered the functional effects of all of Claimant's conditions, including the effects of his diabetes, seizure episodes, hypoglycemia, and his other conditions. Again, Claimant does not identify any functional effects from the cumulative effect of his impairments that the ALJ failed to consider or discuss in formulating his RFC. As far as Claimant's hearing loss, Claimant had conduction deafness at 2000 to 4000 Hz frequencies 25 decibel HI in both ears during his consultative examination in October 2013. (Tr. at 419). Claimant admitted having hearing loss for the past ten years, which included the time period that he was employed. (Tr. at 420). Claimant otherwise did not express complaints related to hearing loss and there is no record that he was treated for hearing loss or suffered any functional limitations. In fact, his hearing was noted to be "intact bilaterally" in November 2013. (Tr. at 461). Furthermore, as stated by the Commissioner, the ALJ concluded that one of the jobs that Claimant could perform despite his numerous restrictions was a document preparation clerk, Dictionary of Occupational Titles (4th ed. 1991) ("DOT") 249.587-018, which is a position which does not require the ability to hear. (ECF No. 17 at 21-22); (Tr. at 24); 1991 WL 672349. To the extent that the ALJ did not elaborate further on the analysis of Claimant's impairments in combination, the undersigned finds further elaboration to be unnecessary. At worst, the lack of further elaboration was harmless error, because the required analysis clearly took place. *See Parker v. Berryhill*, No. 17-2056, 2018 WL 2113790, at *1 (4th Cir. May 8, 2018) (citing *Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon

which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.")).

Therefore, the undersigned **FINDS** that the ALJ complied with his duty under the applicable law to consider Claimant's impairments in combination.

### E. Hypothetical to Vocational Expert

In his final challenge to the Commissioner's decision, Claimant argues that in making his step five finding, the ALJ relied on the vocational expert's expert response to a hypothetical which did not fairly set out all of his impairments because it omitted limitations relating to his seizure activity or calcaneal injury. (ECF No. 12 at 22-23).

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the

national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In this case, the vocational expert testified that an individual with Claimant's characteristics and RFC who would be off task one hour each day outside of normal breaks and lunch (due to pain, seizures, episodes, or whatever symptomology) could not perform any jobs. (Tr. at 65-66). Claimant contends that the off-task limitation should have been included by the ALJ based upon the medical evidence that Claimant suffered frequent seizures requiring recovery lasting longer than an hour. (ECF No. 12 at 22). As discussed above, the ALJ's analysis of Claimant's seizure episodes and associated limitations complied with applicable law. The ALJ remarked that Claimant's symptoms significantly improved once he became compliant with monitoring his blood glucose and reduced to monthly episodes. (Tr. at 20-21). Here, Claimant did not offer evidence that he would be off task one hour each day outside of normal breaks and lunch due to pain, seizures, episodes, or any other symptomology. Therefore, there was no reason for the ALJ to incorporate such a limitation into the hypothetical questions posed to the vocational expert, or rely on the vocational expert's response to such a hypothetical question.

Claimant further argues that it "goes without saying that the ALJ's hypothetical questions [excluded] the life changing nature" of Claimant's "calcaneal injury that changed his gait, ability to stand, walk, and sit without pain." (ECF No. 12 at 23). The ALJ posed a hypothetical question that included, *inter alia*, restrictions to sedentary work; the need to work on level ground; no exposure to ladders, ropes, scaffolding, ramps, stairs, kneeling, crawling, hazards, moving machinery, heights; other postural activities on only an occasional basis; and the ability to maintain concentration and attention in only two

hour increments due to chronic pain noticeable at all times. (Tr. at 64-65). Claimant does not point to any medical evidence or opinions that supported further limitations relating to his calcaneal injury.

Therefore, the undersigned **FINDS** that the ALJ posed a proper hypothetical to the vocational expert and properly relied on the expert's testimony at steps four and five of the sequential evaluation.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 17); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review

by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  June 14, 2018

Cheryl A. Eifert
United States Magistrate Judge

45